AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

APR 27 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                            DEPUTY

| In the Matter of the Search of | )  |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
|  | )  Case No.  **18MJ2038** |
| One (1) black colored Apple Cellular Phone Model: iPhone 7 Plus IMEI: 356710080001021 | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to Distribute Methamphetamine |

The application is based on these facts:

See Affidavit of Special Agent Luis A. Corrales, United States Border Patrol, assigned as a Task Force Officer with the Drug Enforcement Administration, incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Luis Corrales, Task Force Officer, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/27/18

_____
*Judge's signature*

City and state:  San Diego, California

Honorable Jan M. Adler, Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>One (1) black colored Apple Cellular Phone<br>Model: iPhone 7 Plus<br>IMEI: 356710080001021<br><br>One (1) black colored Apple Cellular Phone<br>(with orange adhesive tape within black case)<br>Model: iPhone 7<br>IMEI: 355313088212525<br>FCC ID:  BCG-E3091A<br><br><br>One (1) white and bronze color Apple Cellular Phone<br>Model: iPhone 6<br>IMEI: 358372062372918<br>FCC ID:  BCG-E2816A | **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT** |

I, Luis A. Corrales, an Agent with the United States Border Patrol, assigned as a Task Force Officer with the Drug Enforcement Administration, having been duly sworn, depose and state as follows:

## INTRODUCTION

1.   This affidavit supports an application for a warrant to search the following electronic devices (collectively the **Target Devices**):

> One (1) black colored Apple Cellular Phone
> Model: iPhone 7 Plus
> IMEI: 356710080001021
> (**Target Device 1**), as described in Attachment A-1.

> One (1) black colored Apple Cellular Phone
> (with orange adhesive tape within black case)
> Model: iPhone 7
> IMEI: 355313088212525
> FCC ID:  BCG-E3091A
> (**Target Device 2**), as described in Attachment A-2.

> One (1) white and bronze-colored Apple Cellular Phone
> Model: iPhone 6
> IMEI: 358372062372918
> FCC ID:  BCG-E2816A
> (**Target Device 3**), as described in Attachment A-3.

2.      Agents seized **Target Device 1** on December 10, 2017, from Gregorio Nieto-Montelongo's (NIETO) possession at the time he was arrested at the Interstate 8 (I-8) Campo Border Patrol checkpoint, in Pine Valley, California (Campo Border Patrol Checkpoint), for possession with intent to distribute approximately 34.95 kilograms (77.05 pounds) of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1). At the time of his arrest, NIETO was the driver of a gray 2001 Jeep Cherokee bearing California plates 7EAY887 (Subject Vehicle). **Target Device 1** is currently in the possession of the Drug Enforcement Administration (DEA), San Ysidro Resident Office (SYRO) Non-Drug Evidence Custodian, located at 2255 Niels Bohr Court, San Ysidro, California 92173.

3.      Agents seized **Target Devices 2** and **3** on December 10, 2017, from Cristian Alejandro Garcia-Mora's (GARCIA) possession at the time he was arrested at the I-8 Campo Border Patrol checkpoint, in Pine Valley, California, for possession with intent to distribute approximately 34.95 kilograms (77.05 pounds) of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1). At the time of his arrest, GARCIA was the passenger in the Subject Vehicle. **Target Devices 2** and **3** are currently in the possession of the DEA SYRO Non-Drug Evidence Custodian, located at 2255 Niels Bohr Court, San Ysidro, California 92173.

4.      Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachment B-1 through B-3.

## BACKGROUND AND EXPERIENCE

5.      I have been a federal agent with the United States Department of Homeland Security, Office of the Border Patrol since September 2014. I am currently assigned as a Task Force Officer (TFO) in the DEA San Ysidro Resident Office, San Diego Field Division, in San Diego, California. I have conducted numerous criminal investigations into violations of federal and state law including, but not limited to, narcotics trafficking,

2

weapons violations, and organized criminal activity. Prior to becoming a Border Patrol Agent, I was employed as a police officer with the Doña Ana County Sheriff's Office in New Mexico.

6.     During my law enforcement career, I have obtained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence identification, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of numerous search and seizure warrants.

7.     Based upon my training and experience as a law enforcement officer, I am familiar with the ways in which drug smugglers and traffickers conduct their business. During the course of my duties, I have (a) worked as a co-case agent, directing specific drug-related investigations; (b) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs; (c) participated in the execution of search warrants related to drug investigations; (d) initiated and executed numerous arrests for drug-related offenses, including possession with the intent to distribute; and (e) interviewed criminal defendants, witnesses, and informants in furtherance of investigations into the illegal smuggling and trafficking of controlled substances. Through these duties, I have gained a working knowledge and insight into the operational habits of drug smugglers and traffickers.

8.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers and traffickers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as methamphetamine. Narcotics smugglers and traffickers and their organizations use cellular telephones, in part, because these individuals believe law

3

1   enforcement is unable to track the phone numbers of calls placed to and from cellular

2   telephones.

3       9.      Based upon my training and experience and consultations with law

4   enforcement officers experienced in drug smuggling and trafficking investigations, and all

5   the facts and opinions set forth in this affidavit, I submit the following:

      a.      Drug traffickers will use cellular/mobile telephones because they are
         mobile and they have instant access to telephone calls, text, web, and
         voice messages.

      b.      Drug traffickers will use cellular/mobile telephones because they are able
         to actively monitor the progress of their illegal cargo while the
         conveyance is in transit.

      c.      Drug traffickers and their accomplices will use cellular/mobile
         telephones because they can easily arrange and/or determine what time
         their illegal cargo will arrive at predetermined locations.

      d.      Drug traffickers will use cellular/mobile telephones to direct drivers to
         synchronize an exact drop off and/or pick up time of their illegal cargo.

      e.      Drug traffickers will use cellular/mobile telephones to notify or warn
         their accomplices of law enforcement activity to include the presence and
         posture of marked and unmarked units, as well as the operational status
         of checkpoints and border crossings.

      f.      Drug traffickers and their co-conspirators often use cellular/mobile
         telephones to communicate with load drivers who transport their
         narcotics and/or drug proceeds.

      g.      The use of cellular telephones by conspirators or drug traffickers tends to
         generate evidence that is stored on the cellular telephones, including, but
         not limited to emails, text messages, photographs, audio files, videos, call
         logs, address book entries, IP addresses, social network data, and location
         data.

    10.     Subscriber Identity Module (SIM) Cards also known as subscriber identity

modules are smart cards that store data for GSM cellular telephone subscribers. Such data

4

includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

11. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit. This statement is made in support of an application for a warrant to search cellular telephones that are believed to contain evidence of a violation of 21 U.S.C. § 841(a)(1).

12. Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all of the information known to federal agents regarding this investigation. Instead, it contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, upon conversations with other Border Patrol and DEA Agents, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated.

## FACTS SUPPORTING PROBABLE CAUSE

13. On December 10, 2017, at approximately 4:13 p.m., Border Patrol Agent (BPA) Anthony Magana and his canine partner were assigned to highway interdiction duties in the Campo Border Patrol Station's area of responsibility. At or near that time, BPA Magana observed a 2001 gray Jeep Cherokee bearing California license plate 7EAY887 (Subject Vehicle), pass his position and continue towards the on-ramp to westbound Interstate 8.

14. As the Subject Vehicle passed BPA Magana, BPA Magana observed that the driver, later identified as NIETO, was looking around from left to right as if he were hiding

5

from somebody. BPA Magana was also able to see that there was a passenger, later identified as GARCIA, seated in the front passenger seat.

15.     BPA Magana conducted records checks on the Subject Vehicle and discovered that the Subject Vehicle was registered to Joshua Ayala with an address in Ventura, California. The most recent crossing of the Subject Vehicle was December 9, 2017, at 9:21 p.m. via the Calexico West Port of Entry. BPA Magana also noticed that the crossing history of the Subject Vehicle had six inbound and outbound crossings in a short amount of time. Of these crossings, there were only two drivers associated with the Subject Vehicle, of which neither were the registered owner of the Subject Vehicle.

16.     BPA Magana observed the Subject Vehicle enter Interstate 8 at a high rate of speed. BPA Magana was able to catch-up to the Subject Vehicle two miles west of the Crestwood Road on-ramp where the Subject Vehicle was traveling at approximately 85 miles per hour. BPA Magana advised BPA LeBlanc of his position and BPA LeBlanc assisted in attempting a vehicle stop. When BPA LeBlanc positioned his marked agency service unit behind the Subject Vehicle, NIETO made an abrupt lane change into the left lane. NIETO then slowed the Subject Vehicle down to approximately 50 miles per hour.

17.     BPA Magana conducted a vehicle stop at the Campo Border Patrol Checkpoint where there was adequate lighting and additional Border Patrol Agents. BPA Magana approached the driver (NIETO) of the Subject Vehicle and identified himself to NIETO and GARCIA as a United States Border Patrol Agent. BPA Magana questioned both NIETO and GARCIA as to their citizenship. NIETO stated he was a Permanent Resident in the United States of America. As NIETO was handing over the Permanent Resident Card, BPA Magana observed NIETO's hands trembling uncontrollably. BPA Magana asked NIETO if he was the owner of the vehicle and NIETO stated that his friend, GARCIA, was the owner of the vehicle.

18.     BPA Magana asked NIETO to step out of the vehicle and asked where he was going and NIETO stated that he was going to the Fashion Valley Mall in San Diego,

6

California. BPA Magana asked NIETO if he had any illegal narcotics in the Subject Vehicle. NIETO said that he did not, but as he said so, his lips began to quiver.

19.    BPA Magana then asked GARCIA if he had any cash in excess of $10,000 in the vehicle. GARCIA laughed and said, "No." BPA Magana asked GARCIA if he had any illegal narcotics such as marijuana, heroin, cocaine or methamphetamine in the vehicle. When BPA Magana said methamphetamine, GARCIA looked away and looked down to the ground then responded, "No." In his law enforcement training, BPA Magana believed that GARCIA was trying to be deceptive in his response to methamphetamine.

20.    BPA Magana asked GARCIA how long he had owned the Subject Vehicle. GARCIA stated that he only owned it for about one month. BPA Magana asked GARCIA for consent to search the vehicle. GARCIA stated "Sure." BPA Magana asked GARCIA if he was responsible for all contents in the vehicle. GARCIA stated, "There is nothing in there." BPA Magana explained to GARCIA that his canine partner would perform a canine sniff of the vehicle and GARCIA nodded yes. GARCIA was escorted away from the Subject Vehicle.

21.    BPA Magana then retrieved his canine partner from his service vehicle and performed a canine sniff of the Subject Vehicle. BPA Magana's canine partner alerted to the rear of the Subject Vehicle. BPA Magana drove the Subject Vehicle to the vehicle inspection area of the Campo Border Patrol Checkpoint and conducted a search of it.

22.    At approximately 5:00 p.m., Agents Magana and LeBlanc discovered that there were two spare tires inside the rear compartment of the Subject Vehicle. This appeared extremely suspicious as most vehicles only have one spare tire. As BPA Magana lifted the first tire that was in plain view, it was extremely heavier than a normal spare tire should be. It was a full size tire and not the normal emergency spare tires that usually accompany most vehicles. The second tire which was located underneath in the spare tire compartment was also extremely heavy. BPA Magana observed that the size of the spare tire was P225-70-R16, which was different from the actual tires on the Subject Vehicle. All four tires on the Subject Vehicle were R17 size. As BPA Magana lifted the spare tires,

and bounced them on the concrete, BPA Magana could feel that there was something inside bouncing around. BPA Magana then let the air out of the tires and could smell the odor similar to Febreeze Air Freshener. Febreeze is used as a masking agent to conceal the odor of narcotics from the canines. BPA Magana cut open one of the spare tires and discovered 35 packages of what appeared to be a white crystal-like substance. The packages were all wrapped in plastic freezer bags. The second spare tire also yielded 35 packages.

23.     At approximately 5:15 p.m. a sample of the possible contraband was tested by Agent LeBlanc utilizing a NARKIT II Field Narcotics Identification Kit. The sample tested positive for the properties and characteristics of methamphetamine. NIETO and GARCIA were informed they were under arrest at approximately 5:15 p.m.

24.     Thereafter, NIETO and GARCIA were arrested for violations of Title 21, United States Code, Sections 841(a)(1). During his post-*Miranda* interview, NIETO admitted to knowing that GARCIA and his family were involved in illicit activity. According to NIETO, GARCIA's brother called him and offered him $1,000 to drive the Subject Vehicle to Fashion Valley in San Diego, California. NIETO said he agreed to accompany GARCIA. NIETO admitted he knew he was being paid to transport an illegal substance, although he did not know what the substance was. NIETO said the GARCIA family uses tires to transport narcotics to and from locations.

25.     When I arrived at the Campo Border Patrol Checkpoint, the **Target Devices** were in evidence bags, each bag labeled with the name of either NIETO or GARCIA, in order to identify whose personal effects were contained within each of the respective evidence bags. During their respective post-arrest statements, NIETO claimed ownership of **Target Device 1**, which was in the evidence bag with NIETO's personal effects, and GARCIA claimed ownership of **Target Device 2** and **Target Device 3**, which were both in the evidence bag with GARCIA's personal effects.

26.     Based upon my training and experience as a Border Patrol Agent, and consultations with law enforcement officers experienced in narcotics trafficking

8

investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned that searches of cellular/mobile telephones associated with drug trafficking yields evidence:

    a.    tending to indicate efforts to distribute methamphetamine or some other federally controlled substance through the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers– used to facilitate the distribution of methamphetamine or some other federally controlled substance through the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution of methamphetamine or some other federally controlled substance through the United States;

    d.    tending to identify travel to or presence at locations involved in the distribution of methamphetamine or some other federally controlled substance through the United States;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

    27.    Based on my training, experience, the location of the drugs, and the manner of concealment, I believe the packages consisted of drugs intended for distribution. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics trafficking activities of

NIETO and GARCIA and their co-conspirators, such as telephone numbers, made and received calls, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the cellular telephones described herein.

28.    Finally, drug conspiracies require detailed and intricate planning to successfully evade detection by law enforcement. In my professional training and experience, this requires planning and coordination in the days and weeks and often months prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of their valuable cargo. Accordingly, I respectfully request permission to search the **Target Devices** for data beginning on September 10, 2017, up to and including December 10, 2017.

## METHODOLOGY

29.    It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the devices are subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone

10

1   models using forensic hardware and software. Even if some of the stored information on
2   the device may be acquired forensically, not all of the data subject to seizure may be so
3   acquired. For devices that are not subject to forensic data acquisition or that have potentially
4   relevant data stored that is not subject to such acquisition, the examiner must inspect the
5   device manually and record the process and the results using digital photography. This
6   process is time and labor intensive and may take weeks or longer.

7       30.   Following the issuance of this warrant, I will collect the subject cellular/mobile
8   telephones and subject them to analysis. All forensic analysis of the data contained within
9   the telephones and memory card(s) will employ search protocols directed exclusively to the
10  identification and extraction of data within the scope of this warrant.

11      31.   Based on the foregoing, identifying and extracting data subject to seizure
12  pursuant to this warrant may require a range of data analysis techniques, including manual
13  review, and, consequently, may take weeks or months. The personnel conducting the
14  identification and extraction of data will complete the analysis within ninety (90) days,
15  absent further application to this court.

16  //
17  //
18  //
19  //
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28  //

1

## CONCLUSION

2    32.    Based on all of the facts and circumstances described above, there is probable

3 cause to conclude that NIETO and GARCIA used the **Target Devices** to facilitate violations

4 of Title 21, United States Code, Section 841(a)(1).

5    33.    Because the **Target Devices** were promptly seized during the investigation of

6 NIETO and GARCIA's trafficking activities and have been securely stored, there is

7 probable cause to believe that evidence of illegal activities committed by NIETO and

8 GARCIA continue to exist on the **Target Devices**. As stated above, I believe that the date

9 range for this search is from September 10, 2017, up to and including December 10, 2017.

10    34.    THEREFORE, I request that the court issue a warrant authorizing law

11 enforcement agents and/or other federal and state law enforcement officers to search the

12 items described in Attachment A-1 through A-3, and the seizure of items listed in

13 Attachment B-1 through B-3, using the methodology described above.

14

15            I swear the foregoing is true and correct to the best of my knowledge and belief.

16

17

18                                                    Luis Corrales

19                                                    Task Force Officer
                                                      Drug Enforcement Administration

20

21

22    SUBSCRIBED and SWORN to before me
      this 27th day of April, 2018.

23

24    _____
      Honorable Jan M. Adler

25    United States Magistrate Judge

26

27

28

                                            12

## <u>ATTACHMENT A-1</u>

### PROPERTY TO BE SEARCHED

The following property is to be searched:

One (1) black colored Apple Cellular Phone
Model: iPhone 7 Plus
IMEI: 356710080001021
(**Target Device 1**)



**Target Device 1** is currently in the possession of the Drug Enforcement Administration (DEA), San Ysidro Resident Office (SYRO) Non-Drug Evidence Custodian, located at 2255 Niels Bohr Court, San Ysidro, California 92173.

## ATTACHMENT B-1

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of September 10, 2017, up to and including December 10, 2017:

a.      tending to indicate efforts to distribute methamphetamine or some other federally controlled substance through the United States;

b.      tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of methamphetamine or some other federally controlled substance through the United States;

c.      tending to identify co-conspirators, criminal associates, or others involved in the distribution of methamphetamine or some other federally controlled substance through the United States;

d.      tending to identify travel to or presence at locations involved in the distribution of methamphetamine or some other federally controlled substance through the United States;

e.      tending to identify the user of, or persons with control over or access to, **Target Device 1**; and/or

f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 21, United States Code, Sections 841.